# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-1860V

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |
| CONSTANCE CRABTREE, | TO BE PUBLISHED |
| Petitioner, | |
| v. | Special Master Katherine E. Oler |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: August 26, 2021 |
| | Attorneys' Fees and Costs; Reasonable Basis |
| Respondent. | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |

*Renée Gentry*, Vaccine Injury Clinic, George Washington University Law School, Washington, DC, for Petitioner.
*Heather Pearlman*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON FINAL ATTORNEYS' FEES AND COSTS [1]

On December 1, 2017, Constance Crabtree ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program,[2] alleging that she developed a Chiari malformation as a result of the Fluvirin vaccination she received on January 9, 2015. Pet. at 1-2, ECF No. 1.

On July 18, 2020, Petitioner filed a motion for attorneys' fees and costs (hereinafter Petitioner's application for fees or "Fees App.") requesting a total of $27,201.25. Fees App., ECF No. 39. On August 31, 2020, Respondent filed a response to Petitioner's application, challenging

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

whether the petition had been filed with a reasonable basis, as "petitioner alleged that a congenital defect, a Chiari malformation, was caused by a single flu shot." Fees Resp. at 7, ECF No. 41. Petitioner filed a reply on September 4, 2020 stating there was reasonable basis to file her claim. Fees Reply, ECF No. 42.

For the reasons set forth below, I hereby **GRANT IN PART** Petitioner's application for attorneys' fees and costs and award a total of **$26,533.89**.

## I. Procedural History

Petitioner filed her petition on December 1, 2017. ECF No. 1. This case was reassigned to my docket on January 29, 2018. ECF No. 12. Petitioner filed medical records on March 19, 2018. Exs. 1-6, ECF No. 13. Petitioner filed an affidavit on March 23, 2018 and two affidavits from her daughters on April 11, 2018. Ex. 9, ECF No. 14; Exs. 10-11, ECF No. 16.

On October 30, 2018, Respondent file a Rule 4(c) Report stating compensation is not appropriate in this case because "petitioner has not established by preponderant evidence that she suffers from a Chiari malformation, or that her alleged injuries were caused by the flu vaccine." Resp't's Rep. at 1, ECF No. 22.

On November 4, 2019, Petitioner filed an expert report from Dr. Noel Peterson, a naturopathic doctor. Ex. 12, ECF No. 28.

On April 14, 2020, Respondent filed a responsive expert report from Dr. Michael Wilson, a neurologist, disputing Petitioner's claim that she had a Chiari malformation and that a Chiari malformation can develop after vaccination. *See* Ex. A, ECF No. 31.

I held a status conference with the parties on April 17, 2020 where I informed Petitioner that I found Dr. Wilson's expert report to be highly persuasive and do not think that Petitioner has the injury she alleges. *See* Minute Entry on 4/17/2020; *see also* Scheduling Order on 4/17/2020, ECF No. 32. During the status conference, I requested that Ms. Gentry inform her client of my views regarding her case. *See* Scheduling Order on 4/17/2020, ECF No. 32. Ms. Gentry requested 30 days to file a status report on how Petitioner would like to proceed. *Id.* I granted that request. *Id.*

On May 18, 2020, Petitioner filed a status report informing the Court of her intent to file a motion to dismiss within the week. ECF No. 33. On May 19, 2020, Petitioner filed a motion to dismiss her petition, which I subsequently granted on the same day. ECF Nos. 34-35.

On July 18, 2020, Petitioner filed a motion for attorneys' fees and costs. Fees App., ECF No. 39. Respondent filed a response to Petitioner's motion on August 31, 2020 contesting reasonable basis. Fees Resp., ECF No. 41. On September 4, 2020, Petitioner filed a reply. Fees Reply, ECF No. 42.

This matter is now ripe for adjudication.

## II.     Petitioner's Relevant Medical History

On January 9, 2015, Petitioner received a seasonal flu vaccine from a Rite Aid Pharmacy. Ex. 4 at 1. Petitioner was 65 years old at the time of vaccination, with a past medical history of depression, psoriasis, inflammatory arthritis in her wrists and elbows, and microscopic, lymphocytic colitis with chronic diarrhea. Ex. 1 at 32, 100; Ex. 7 at 106-07.

On March 12, 2015, Petitioner visited Dr. Rita Lahlou, her primary care physician, at the Oregon Health and Science University (OHSU), presenting with a cough, low grade fever, dizziness, lethargy, an increased heart rate, and headache. Ex. 1 at 190. During this visit, Petitioner claimed she had been experiencing these symptoms since her flu shot in January. *Id*. Dr. Lahlou's assessment was that Petitioner's symptoms were related to an upper respiratory viral illness, dehydration, and possibly allergies. *Id.* at 192. The records also note that Petitioner's brother was experiencing bronchitis at this time. *Id.* at 190.

On April 16, 2015, Petitioner was seen by Dr. Nancy Zink, also at OHSU, complaining of headache, depression, anxiety, racing heart, and diarrhea. Ex. 1 at 194. Dr. Zink noted that Petitioner suspected she had a bacterial infection, avian paratuberculosis, or Epstein-Barr virus. *Id*. Dr. Zink's primary impression was that Petitioner was depressed and discussed beginning medication and counseling. *Id.* at 195.

On June 9, 2015, Petitioner again visited Dr. Lahlou complaining of the same symptoms: "significant fatigue, daily headaches, dizziness, generalized weakness since mid-January, which she associates with getting the flu shot." Ex. 1 at 197. Petitioner requested to have mycobacterium testing done, did not begin medication or counseling for her depression, and speculated on whether she had Guillain-Barré syndrome ("GBS"). *Id.* Dr. Lahlou stated "Pt concerned about possible GBS following influenza vaccine, though her strength and reflexes are intact." *Id.* at 200. Dr. Lahlou ordered an MRI and x-rays to assess Petitioner's headaches and diagnosed her with an Epstein-Barr infection. *Id.*

On June 24, 2015, a brain MRI was performed, which revealed no intracranial abnormalities. Ex. 1 at 97-100. The MRI did reveal "slightly low-lying right cerebellar tonsil". *Id.* at 100.

On July 9, 2015, Petitioner submitted a Vaccine Adverse Event Reporting System ("VAERS") report, claiming her adverse events included "bronchitis, headaches, rapid heartbeat, low grade fever, tremors, anxiety attacks, exhaustion, blurred vision, nightblindness, tongue sensitivity, heat intolerance, diarrhea, burping, gagging, vomiting bile, urinary incontinence, numbness in arms and legs, brain fog, hernia." Ex. 8.

On July 30, 2015, Petitioner visited Dr. Monina Pascua, a gastroenterologist, at the Oregon Clinic, for her microscopic colitis. Ex. 5 at 11.

On September 30, 2015, Petitioner followed up with Dr. Pascua and reported she had her first normal bowel movement in six years. Ex. 5 at 8. Dr. Pascua noted that Petitioner's microscopic colitis was improved. *Id.* Dr. Pascua noted Petitioner's family history of colon cancer and recommended she get a colonoscopy. *Id.*

3

On January 14, 2016, Petitioner visited Dr. Noel Peterson, a naturopathic doctor, at the Center for Traditional Medicine. Ex. 2 at 10. Petitioner reported to Dr. Peterson that she experienced a severe cough, vomiting with cough that went on for eight months.[3] Ex. 2 at 12. Dr. Peterson also assessed Petitioner's June 2015 brain MRI as "suspicious of Chiari syndrome." *Id.* at 11. Petitioner was injected with a "Platelet Rich Plasma" ("PRP") during this visit. *Id.*

On March 8, 2016, Petitioner saw Dr. Peterson again, reporting her migraines were milder but would increase in severity in the afternoon and that she continued to have nausea. Ex. 2 at 9. She received another PRP injection during this visit.

Petitioner received additional PRP injections on April 18, 2016 and June 1, 2016. Ex. 2 at 6, 8. It was noted during her June 1, 2016 visit that Petitioner's headaches and vomiting were less frequent. *Id.* at 6. Dr. Peterson also noted "Possible Arnold Chiari malformation/syndrome." *Id.*

On June 3, 2016, Petitioner returned to Dr. Pascua for a follow-up. Ex. 5 at 5. Petitioner informed Dr. Pascua she had been diagnosed with a Chiari malformation and was being treated with PRP injections. *Id.* Dr. Pascua noted that "This is supposed to loosen the ligaments and help with headaches and vomiting. So far, she has noticed marked improvement in her headaches and vomiting episodes because of this therapy." *Id.* Dr. Pascua reiterated her concern regarding Petitioner's family history of colon cancer and recommended a colonoscopy. *Id.*

Petitioner continued to be seen by Dr. Peterson with visits on July 21, 2016, August 31, 2016, November 10, 2016, and January 5, 2017. Ex. 2 at 1-5. On the July 21, 2016 visit, Dr. Peterson noted Petitioner no longer experienced vomiting or severe headaches. *Id.* at 5.

On March 1, 2018, Petitioner visited Dr. Anup Panduranga, a neurologist at OHSU, with complaints of intractable headaches and vertigo. Ex. 7 at 132. Petitioner informed Dr. Panduranga that these symptom "started after flu vaccine in 2015 and have continued." *Id.* Petitioner expressed concerned that she had ADEM or another demyelinating disease, to which Dr. Panduranga noted, "MRI brain was not consistent with this and lumbar puncture showed no signs of demyelination (negative oligoclonal bands, normal IgG synthesis rate and normal myelin basic protein)." *Id.* at 133. Dr. Panduranga "informed patient that while it is possible [she] could have had some ADEM-type reaction to influenza vaccine in 2015, there is no evidence of ongoing CSF inflammation/infection." *Id.* at 133-34. Dr. Panduranga stated he believed her headaches were secondary to cervical spondylosis which was noted on her cervical spine MRI. *Id.* at 134.

### III. Expert Reports

#### A. Report of Noel Peterson, ND, DAAPM

Petitioner submitted a report from Dr. Noel Peterson. Ex. 12 (hereinafter "Peterson Rep."). Dr. Peterson's biography from the Oregon Regenerative Health website was submitted in lieu of a curriculum vitae. Ex. 13. Dr. Peterson received his Bachelor of Science degree at Kansas Newman

---

[3] There were a number of other symptoms that Petitioner reported to Dr. Peterson but these notes were handwritten and difficult to read.

College, and received a Doctor of Naturopathic Medicine degree at the National College of Naturopathic Medicine. *Id.* at 2. According to the website of the American Association of Orthopedic Medicine, naturopathic doctors receive their education and training in accredited naturopathic medical colleges. *See* https://naturopathic.org/page/WhatisaNaturopathicDoctor (last visited August 25, 2021). The website further indicates:

> Naturopathic medical education curricula include certain areas of study not covered in conventional medical school. At the same time, aspiring naturopathic doctors receive training in the same biomedical and diagnostic sciences as MDs and osteopathic doctors (DOs). The result is a comprehensive, rigorous, and well-rounded scientific medical education that is both comparable and complementary to that of MDs and DOs.

*Id.*

Dr. Peterson serves as the medical director of Oregon Regenerative Medicine and is recognized for his expertise in the practice of prolotherapy, platelet rich plasma, and autologous stem cell regenerative medicine. Ex. 13 at 1, 2. Dr. Peterson is Certified in Prolotherapy by the American Association of Orthopedic Medicine. *Id.* According to his biography, Dr. Peterson "serves on the scientific Institutional Review Board of the International Cellular Medicine Society (cellmedicinesociety.org), representing physicians and researchers from over 35 countries who share a mission to provide scientifically credible and medically appropriate cell-based treatments to informed patients." *Id.*

In his report, Dr. Peterson began by summarizing his treatment of the Petitioner. He indicated that he first saw Petitioner on August 11, 2004[4] with complaints of psoriasis, lead poisoning, and wrist pain. Peterson Rep. at 1. Dr. Peterson treated Petitioner was "omega fatty acids, and homeopathic Ruta graveolens and Rhus toxicodendron." *Id.* Dr. Peterson saw Petitioner again on February 14, 2008 for wrist pain, thumb osteoarthritis, and degenerative joint disease. *Id.* Dr. Peterson used platelet rich plasma injections to treat Petitioner's wrist and thumb pain. *Id.*

Dr. Peterson noted Petitioner returned on June 15, 2015 for wrist pain. Peterson Rep. at 1. During this visit, Petitioner informed Dr. Peterson that she had received a flu shot on January 9, 2015 and she had experienced "intermittent fevers, body shaking, rapid pulse, and as a result felt miserable and unable to work since that date." *Id.* Dr. Peterson provided prolotherapy to Petitioner's wrists during this visit but did not treat her other symptoms. *Id.*

Petitioner returned to Dr. Peterson on January 14, 2016 for her chronic daily coughing. Peterson Rep. at 1. Dr. Peterson stated Petitioner informed him that the cough began "2 days after receiving a flu shot on January 7, 2015."[5] *Id.* Dr. Peterson additionally noted that according to Petitioner, her cough was so severe that she developed gastroesophageal reflux symptoms and was frequently dry heaving and vomiting daily, experiencing daily migraine headaches, and the base

---

[4] Dr. Peterson's report stated his first interaction with Petitioner was August 11, 20104 [sic]. Ex. 12 at 1. Due to his next interaction with Petitioner being on February 14, 2008, it can only be assumed that he did not intend to type either 2010 or 2014.

[5] Petitioner received the flu shot on January 9, 2015.

of her skull was sore. *Id.* Petitioner provided Dr. Peterson with her MRI report dated June 24, 2015, where the radiologist noted that the right cerebellar tonsil extended 3mm at the level of the foramen magnum and summarized his findings as a "slightly low-lying right cerebellar tonsil." *Id.* at 2. With regards to the MRI, Dr. Peterson opined that he was "familiar with the Chiari malformation, and with the phenomenon of traumatic Chiari." *Id.* Although Dr. Peterson stated "only an upright MRI can adequately reveal a traumatic [Chiari], … [Petitioner's] range of symptoms could be explained by Type 1 Chiari, induced by trauma." *Id.* He further opined that Petitioner's "history of chronic severe coughing could explain a traumatic presentation of low lying cerebellar tonsils." *Id.* To treat Petitioner's cervical pain, Dr. Peterson provided a PRP injection "into the upper cervical spine and into the suboccipital fascia superior to the inferior nuchal line." *Id.*

Dr. Peterson also provided a summary of Petitioner's visits and symptoms from the rest of 2016 and from Petitioner's last visit on January 5, 2017. Peterson Rep. at 2-3.

Dr. Peterson opined that Petitioner's flu vaccination caused her condition. He stated,

> It is my medical opinion that the onset of a chronic cough after flu vaccination would exert a significant repetitive trauma sufficient to weaken the fascial integrity of the craniocervical junction, causing the cerebellar tonsils to descend into the foramen magnum, and with the added forces of vomiting and dry heaves, be etiologic in the onset of Chiari syndrome, including severe migraine-like headaches. The timing of the onset would implicate the flu vaccination as the cause of the chronic cough. The repetitive trauma of coughing could be reasonably expected to induce craniocervical trauma. The response to prolotherapy is supportive of a traumatic origin of these symptoms.

*Id.* at 3. Dr. Peterson cited two pieces of medical literature, which he stated demonstrate an association between minor craniocervical trauma and the onset of traumatic Chiari Syndrome and also support a conversion to acute Chiari syndrome after minor head or neck trauma. *Id.* Neither piece of medical literature was filed into the record.

### B. Report of Michael Wilson, MD, MAS, FAAN

Respondent filed an expert report from Dr. Michael Wilson. Ex. A (hereinafter "Wilson Rep."). Dr. Wilson received his medical degree from the University of California, San Francisco, and completed his residency through the Harvard Neurology Residency Program at Massachusetts General Hospital and Brigham and Women's Hospital. Ex. B at 1. Dr. Wilson is a board certified in neurology, with subspecialty training in neuro-infectious diseases and neuroimmunology; he is currently an associate professor in neurology at the University of California, San Francisco School of Medicine. *Id.* at 1-2; Wilson Rep. at 1. Dr. Wilson serves as a reviewer for numerous publications including, but not limited to, Neurology, JAMA Neurology, Journal of Neurovirology, Frontiers in Neurology, and the New England Journal of Medicine. *Id.* at 4-5. Dr. Wilson is also actively involved in research related to neurology and has published 47 peer-reviewed papers. *Id.* at 15-17, 20-24.

Dr. Wilson's report briefly summarized Petitioner's medical history. Wilson Rep. at 2-3. Dr. Wilson identified Dr. Peterson's citations as a review and a case report. *Id.* at 3. Dr. Wilson definitively stated that Petitioner does not have a Chiari I malformation because her left cerebellar tonsil was not low lying and her right cerebellar tonsil was only 3 mm below the foramen magnum. *Id.* at 4. A Chiari I malformation is defined as abnormally shaped cerebellar tonsils that are more than 5 mm below the foramen magnum. *Id.*; Ex. C at 2. Dr. Wilson additional stated that Chiari malformations are congenital and are not acquired abnormalities. Wilson Rep. at 4.

Dr. Wilson also noted that Petitioner's most prominent symptoms were coughing, nausea/vomiting and headache and it was noted in her records that Petitioner's brother had bronchitis around the same time. Wilson Rep. at 4. Petitioner did not have a thorough work-up to diagnose her cough. *Id*. Dr. Wilson also identified Petitioner's history of oligoarticular inflammatory arthritis as another causative factor for Petitioner's symptoms. *Id.* Dr. Wilson stated that rheumatoid arthritis is associated with pulmonary complications such as pleural effusions, pulmonary fibrosis, bronchiolitis obliterans, and vasculitis, which can cause coughing. *Id.* Dr. Wilson added that Petitioner never saw a pulmonologist or rheumatologist to confirm these diagnoses. *Id.* Dr. Wilson also added that untreated microscopic, lymphocytic colitis can cause nausea, vomiting, and a dry cough as a result of inflammation in the upper gastrointestinal tract. *Id.* Finally, Dr. Wilson reiterated that Petitioner's visit with Dr. Panduranga showed no evidence of a Chiari malformation and no inflammatory process that could have been triggered by a vaccination. *Id.*

Dr. Wilson stated that Petitioner had a number of pre-existing conditions that predisposed her to a number of the symptoms she experienced such as joint pain, fatigue, persistent cough, and gastrointestinal symptoms such as loose stool, nausea, and vomiting. Wilson Rep. at 5. There was no evidence to show that the vaccine triggered a peripheral or central nervous system inflammatory syndrome. *Id.*

## IV. Parties' Arguments

Respondent argued that Petitioner failed to establish a reasonable basis for her petition and therefore should not receive an award of attorneys' fees and costs. Fees Resp. at 1. Citing the Federal Circuit's decision in *Perreira*, Respondent noted that in a reasonable basis inquiry, "a court should look not at the likelihood of success, but instead assess the feasibility of the claim, and [P]etitioner must offer more than an unsupported assertion that a vaccine caused an injury." *Id*. at 8 (citing *Perreira v. Sec'y of Health & Hum. Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

Respondent stated that Petitioner has alleged that a congenital defect, a Chiari malformation, was caused by the flu vaccine but none of the records filed in the record support such a diagnosis. Fees Resp. at 7. Respondent additionally stated that the expert report filed by Dr. Peterson was "facially insufficient" and a "cursory review of the medical literature regarding Chiari malformation should have alerted [Petitioner's counsel] that petitioner's bare allegations of vaccine causation were specious and could not be supported under the preponderant evidence standard of a cause-in-fact claim." *Id.*

7

Petitioner stated that I made a determination during the status conference held on April 17, 2020, that Petitioner did not have a Chiari malformation and that Petitioner cannot establish entitlement to compensation without proof that she sustained her alleged injury. Fees Reply at 1. Petitioner also cited to *Cottingham*, where the Federal Circuit found that "references to Petitioner's injuries/symptoms in seven medical records, as well as listing those symptoms on the Gardasil package constituted minimal circumstantial, objective evidence supporting causation." *Id.* at 3; *Cottingham*, at *17. Petitioner argued that medical records referencing her coughing immediately after vaccination and additional medical records noting her vomiting, dry heaving, headaches, and dizziness support her theory that she had a Chiari malformation. *Id.* at 3. Petitioner also cited to Ex. 2 and Ex. 7 at 21 as proof that Petitioner's medical records did indicate she had a Chiari malformation. *Id.* Petitioner's submission of an expert report from Dr. Peterson linked Petitioner's symptoms to a Chiari malformation and Petitioner's diagnosis of a Chiari malformation was prohibited by the lack of an upright MRI in Oregon. *Id.* at 4.

## IV.   Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, the special master must determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

### A.   Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B.   Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found

8

that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 2019-1596, 971 F.3d 1337, 1346 (Fed. Cir. Aug. 19, 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

The Federal Circuit has noted that determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 U.S. Claims LEXIS 1437 at *13 (Fed. Cir. July 6, 2021). Citing the Fourth Circuit's ruling in *Sedar v. Reston Town Ctr. Prop., LLC*, the Federal Circuit has characterized "more than a mere scintilla" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *13, *citing Sedar v. Reston Town Ctr. Prop., LLC* (988 F.3d 756, 761 n.3 (4th Cir. 2021); *see also Kurtz v. Fels*, 63 Wash. 2d 871, 878 (Wash. 1964) (holding that proof beyond a mere scintilla requires "facts to be assessed by the senses" and something "tactile" rather than calculations); *Gibson v. Epting*, 426 S.C. 346, 352 (S.C. 2019) (describing scintilla as a "perceptible amount" and "not something conjured up by the shadows.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018).

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). A Petitioner need not provide medical or expert opinion on causation to show reasonable basis for her claim. *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *19. While a Special Master may consider the absence of relevant medical opinion

as a factor in determining whether a claim had reasonable basis, such absence is not dispositive of the issue. *Id.* at *16.

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

### C. Attorneys' Fees and Costs

The Vaccine Act permits reimbursement of "reasonable" attorneys' fees and costs. § 15(e)(1). Special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991). The Federal Circuit has endorsed the use of the lodestar approach, in which a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). The court may then make an upward or downward departure from the initial calculation based on other specific findings. *Id.* at 1348. Although not explicitly stated in the statute, attorneys' costs are also subject to a reasonableness requirement. *See Perreira*, 27 Fed. Cl. 29 at 34.

Petitioner bears the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). However, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd* No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cl. 1993).

## V. Discussion

### A. Good Faith

Petitioner is entitled to a presumption of good faith. *See Grice*, 36 Fed. Cl. 114 at 121. Respondent does not challenge Petitioner's good faith. *See* Fees Resp. fn 3. Based on my own review of the case, I find that Petitioner acted in good faith when filing this petition.

### B. Reasonable Basis

Petitioner's theory is that she developed coughing, then subsequent vomiting and dry heaving as a result of her flu vaccination. The coughing was severe enough to cause the cerebellar tonsils to descend into the foramen magnum. This resulted in her symptoms of severe headaches. Peterson Rep. at 3. Petitioner's medical records indicate that she began to experience severe

coughing two days after her vaccination, which progressed to vomiting and "horrible HA [headache] from vomiting." Ex. 2 at 12. Her records also note that she had a diagnosis of "Chiari malformation type I". Ex. 7 at 21. These records provide some evidence in support of Petitioner's claim.

In addition to these medical records, Petitioner also filed an expert report from Dr. Peterson, a naturopathic doctor. Although Dr. Peterson is not a neurologist, according to the American Association of Orthopedic Medicine's website, as a naturopathic doctor, he "receive[d] training in the same biomedical and diagnostic sciences as MDs and osteopathic doctors." *See* American Association of Naturopathic Physicians, *What is a Naturopathic Doctor?*, https://naturopathic.org/page/WhatisaNaturopathicDoctor (last visited August 25, 2021). Dr. Peterson opined that "the onset of a chronic cough after flu vaccination would exert a significant repetitive trauma sufficient to weaken the fascial integrity of the craniocervical junction, causing the cerebellar tonsils to descend into the foramen magnum, and with the added forces of vomiting and dry heaves, be etiologic in the onset of Chiari syndrome…" Peterson Rep. at 3. This opinion, in conjunction with the medical records provides Petitioner with a reasonable basis.

In order to find that Petitioner did not establish a reasonable basis to support her claim, I would need to find that Dr. Peterson's report did not amount to a more than a mere scintilla of evidence. I am not prepared to make such a finding. While Dr. Wilson was both compelling and persuasive in articulating that Petitioner did not have a Chiari malformation and that the flu vaccine did not (and likely could not) cause her condition, these are still questions that I would necessarily have weighed at an entitlement hearing, had Petitioner not dismissed her claim. The relative weight I have assigned to Dr. Wilson's opinion does not reduce Dr. Peterson's opinion to something below more than a mere scintilla of evidence. Because of that, I find Petitioner has established a reasonable basis to support her claim.

## VI. Attorneys' Fees and Costs

Petitioner requests a total of $27,201.25 in attorneys' fees and costs. Fees App. at 1, ECF No. 39. This includes $11,992.00 for work performed by attorneys Shoemaker and Gentry, $13,347.25 for work performed by student attorneys at the GW Vaccine Injury Litigation Clinic, and $400.00 for the Court's filing fee. *Id.* Petitioner also incurred $1,462.00 of her own out-of-pocket expenses. *Id.*

### A. Reasonable Hourly Rate

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of

11

Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[6]

Ms. Gentry requests to be compensated at an hourly rate of $445.00 for 2019 and $464.00 for 2020. Mr. Clifford Shoemaker requests to be compensated at an hourly rate of $440.00 for 2017; $450.00 for 2018; and $460.00 for 2019. Ms. Gentry also requests compensation for the students who worked on this case through the George Washington University Vaccine Injury Litigation Clinic a rate of $145.00 per hour. This request is consistent with what I and other special masters have previously awarded Ms. Gentry, Mr. Shoemaker, and the student attorneys at the GW Clinic. *See, e.g.*, *Davis v. Sec'y of Health & Hum. Servs.*, No. 15-159V, 2017 WL 877277 (Fed. Cl. Spec. Mstr. Feb. 7, 2017); *Smith v. Sec'y of Health & Hum. Servs.*, No. 14-982V, 2020 WL 1893464 (Fed. Cl. Spec. Mstr. Mar. 18, 2020); *Irwin v. Sec'y of Health & Hum. Servs.*, No. 16-1454V, 2020 WL 2510421 (Fed. Cl. Spec. Mstr. Apr. 9, 2020); *Hoefling v. Sec'y of Health & Hum. Servs.*, No. 18-1935V, 2020 WL 6109440 (Fed. Cl. Spec. Mstr. Sep. 14, 2020); *Temes v. Sec'y of Health & Hum. Servs.*, No. 16-1465V, 2021 WL 2375787 (Fed. Cl. Spec. Mstr. Apr. 15, 2021).

Accordingly, I find the requested rates to be reasonable and that no adjustment is warranted.

### B. Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9

---

[6] The 2015–2016 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2015-2016.pdf.
The 2017 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.
The 2018 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.
The 2019 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

(Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g., McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed. Fees App. I find the hours to be largely reasonable, but a small reduction is necessary due to billing for what appears to be administrative tasks, vague billing entries, and overbilling by the student attorneys.[7] These entries include "Filing", "Prepare exhibits", "Update case status memo", "Filing (box)", "Uploading and organizing files … to be paginated for exhibits", "Crabtree medical file download and searching", and corresponding with medical providers to get medical records. Because several of these entries are part of larger blocks of time, I will reduce the student attorneys' fees awarded by 5% for a total reduction of $667.36.

Total attorneys' fees to be awarded: **$24,671.89.**

### C. Reasonable Costs

Petitioner requests to be compensated $1,462.00 for her out-of-pocket expenses. Petitioner's counsel also requests $400.00 for the Court's filing fee. Fees App. at 1.

1. <u>Dr. Peterson's Expert Fees</u>

Petitioner requests $1,425.00 for Dr. Peterson's expert fees. Fees App. at 22. Dr. Peterson billed at an hourly rate of $475.00 per hour and spent three hours on his expert report, which included review of Petitioner's records, relevant research, and writing the report itself. I find that the overall cost for the work performed is appropriate. Dr. Peterson's fees are awarded in full.[8]

2. <u>Other Miscellaneous Costs</u>

Ms. Gentry requests $400.00 for the Court's filing fee. Additionally, Petitioner incurred out-of-pocket expenses totaling $37.00 for procuring medical records. I find these requests to be reasonable and grant them in full.

Total costs to be awarded: **$1,862.00.**

### VII. Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of fee and cost awards, and based on the foregoing, I **GRANT IN PART** Petitioner's application, as follows:

> A lump sum in the amount of **$1,462.00**, representing reimbursement of Petitioner's costs in the form of a check payable to Petitioner, Constance Crabtree.

---

[7] *See* entries on 2/21/2018, 2/27/2018, 3/12/2018, 3/19/2018, 3/23/2018, 10/4/2019, 10/28/2019, 10/30/2019, 10/31/2019, 11/4/2019, 11/6/2019, 11/13/2019, 3/15/2020, 4/14/2020.

[8] In making this determination, I have not analyzed whether Dr. Peterson's expert rate is appropriate.

A lump sum in the amount of **$25,071.89**, representing reimbursement of Petitioner's final attorneys' fees and costs in the form of a check jointly payable to Petitioner and her attorney, Ms. Renée Gentry.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with this decision.[9]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.